272 So.2d 286

**Wayland Earl BRYANT and Ronald Elliott Williams**

v.

**STATE.**

6 Div. 339.

Court of Criminal Appeals of Alabama.

Nov. 21, 1972.

Rehearing Denied Dec. 12, 1972.

Drake, Knowles & Still, University, for appellants.

362

William J. Baxley, Atty. Gen., and Joseph G. L. Marston, III, Asst. Atty. Gen., for the State.

TYSON, Judge.

The indictment against Wayland Earl Bryant charged him with the felonious assault with a shotgun on David Wayne Orange, a deputy sheriff of Jefferson County, Alabama; and the indictment against Ronald Elliott Williams charged him with the felonious assault with a rifle on Royce Johnson, a deputy sheriff of Jefferson County, Alabama, each of said deputy sheriffs being in the performance of their lawful duties.

The two appellants were tried together by agreement between defense counsel, each of the appellants, and the District Attorney's office with separate verdicts being rendered by the Jury as to each appellant. Each appellant was found guilty of assaulting the respective officers as set forth in the indictments, and judgment fixed sentence at five years imprisonment in the penitentiary for each appellant.

The State of Alabama presented the testimony of four deputy sheriffs who told of going to a residence located at 222 Jefferson Boulevard, Tarrant City, Jefferson County, Alabama, the residence of one Mrs. Bernice Turner, at approximately 11:45 on the morning of September 15, 1970, to effect an eviction of these premises, prior notice having been served by the Sheriff's office. According to Deputy Sheriff Major David Wayne Orange, information had been received by Deputy Sheriff Sergeant C. C. Gillespie, Birmingham City Detective Sergeant Marcus

Jones, and Federal Bureau of Investigation Agent Sizemore of the Birmingham, Alabama office that members of the Alabama Liberation Front or Black Panthers were planning an ambush at the premises in question. This information was communicated to the various Sheriff's deputies who were to participate by a meeting held at about 8:00 on the morning of September 15, 1970, at the office of Jefferson County Sheriff Melvin Bailey.

At trial the trial judge directed that the affidavits given to Sheriff Melvin Bailey by each officer participating in the investigation be turned over to defense counsel for use in cross-examination of these officers, and such affidavits were subsequently offered in evidence. Deputy Sheriff Major David Wayne Orange's affidavit reads as follows:

" MELVIN BAILEY

SHERIFF, JEFFERSON COUNTY

JEFFERSON COUNTY COURT HOUSE

BESSEMER DIVISION,

BESSEMER, ALABAMA, 35020

September 18, 1970

"Monday night, September 14, 1970, at about 9:00 P.M., I talked with Sergeant C. C. Gillespie who informed me that he had information that the Black Panther Party was planning to ambush two officers who were going to execute a court order of eviction at 222 Jefferson Boulevard, Tarrant City. I immediately called Sheriff Bailey and informed him of these plans by the Black Panther Party. It was decided that we would make plans for our action the following morning.

"Shortly thereafter, I received a call from Detective Sergeant Marcus Jones, who is with the Police Department with the City of Birmingham. He, in substance, gave me the same information

that I had received a few minutes earlier from Sergeant Gillespie. The following morning it was decided that we would procced with the court order, and plans were made to take enough men to insure the successful execution of this court order.

"During the morning of September 15, 1970, I received further information from Sergeant Jones that the Black Panther's had four or five men inside the house at 222 Jefferson Boulevard, Tarrant City, waiting for our two officers to appear. I, along with about 15 other officers, arrived at this address at about 11:50 A.M., September 15, 1970. We were armed with tear gas guns, shotguns, and rifles along with our regular side arms. At about 11:55 A.M., Deputy Monteith approached the front door of 222 Jefferson Boulevard, Tarrant City, and knocked on the door several times. He waited a few seconds and knocked several times again. There was no sound from within the house in answer to these knocks on the door. Deputy Monteith called out in a loud voice to the people inside the house stating who he was and what his business there was. No answer came from the house.

"I walked over to the sidewalk in front of the house and told Captain J. C. Williams that I was going to kick the door open. Captain Williams and I approached the house from the southwest corner, and I kicked the door twice. The second time the door swung into the house, and I immediately saw standing in the second room Wayland Bryant, who was armed with a shotgun. At this time I heard one of the officers to my left and behind me shout a warning to the other deputies, 'Look out! He has a gun.' Almost in this same instant Captain Williams and I ordered Wayland Bryant to drop the shotgun he was holding. In response to this command, Wayland Bryant swung his gun to bear upon Captain Williams and myself. At this same instant, the Sheriff's Department

fired a tear gas shell into the house, and Captain Williams and I backed away from the door under the cover of firing from our officers. At this point, Captain Williams fell down in front of the door and was exposed to the house for five seconds or more. More tear gas was fired into the house; and after several shots had been fired, people appeared at the front door shouting they were coming out. We ordered these people to lay down on their stomachs with their hands outstretched and to crawl to the middle of the street. This order was obeyed, and four men and one woman crawled out into the middle of the street.

"Within a few seconds, officers wearing gas masks went into the house to see if anyone was still inside. There was no one inside the house at this time.

"The five people who came out of the house and who were arrested were Wayland Earl Bryant, black male, age 42, from whom I took a Black Panther button off the front of his shirt; Ronald Williams, black male, age 24, who was wounded in the left side of his jaw or neck; Harold Robertson, black male, age 27; Robert Jakes, black male, age 22, and Brenda Joyce Griffin, black female, age 19.

"An ambulance was called, and Ronald Williams and either Harold Robertson or Robert Jakes were sent to the hospital. The remaining three were put into patrol cars and sent to the Jefferson County Jail.

"/s/ David Orange
Major David Orange
Assistant to the Sheriff"

The affidavit of Deputy Sheriff James L. Monteith, which was also placed in evidence, reads as follows:
"9-17-70.

"Subject: Eviction of Bernice Turner, 222 Jefferson Blvd., Tarrant, Alabama.

"On Tuesday the 15th of September, 1970, at approximately 11:45 A.M., Depu-

ty Fikes and myself arrived at 222 Jefferson Boulevard to carry out a Circuit Court order to evict Bernice Turner from these premises, we had had previous information that it was a trap set up for us. When we arrived I went to the right hand side of the front door and Deputy Fikes took a position to the left of the house. I knocked loudly and got no response, I knocked again and still no one came to the door, I could hear a radio playing inside and also someone moving about. Capt. Williams told me to knock again and identify myself—I knocked again and told them that this was the

Sheriff's Department and that I had an eviction writ. I knocked a fourth time and announced who I was. At this time Major Orange stepped beside me and kicked the front door open, he and Capt. Williams shouted that they, the occupants, have guns. Capt. Williams, Major Orange and myself retreated to cover of the patrol car parked on the street. Major Orange told the occupants to come out and when they refused, tear gas was order fired into the house—Then there was some shooting, shortly 4 black males and 1 black female came out of the house. Major Orange told them to lie down in the street next to the patrol cars.

"Capt. Williams and Lt. Rauch checked out the house and said it was clear. After the tear gas subsided I proceeded to evict the premises. At 12:15 P.M., Bernice Turner came on the scene and wanted to know what was happening. She was told that she was being evicted. When the furniture was taken from the house I took the men who were working for me and left.

"/s/ James L. Monteith
Deputy"

Additionally, Deputy Royce Johnson testified that he was present on the date and place in question, as part of his duties, and observed Deputies Monteith and Fikes first go to the door and knock two or three times and announce in a loud voice as to who they were. When there was no answer, Major Orange and Captain Williams then knocked two or three times and again announced who they were, and upon failure to have anyone answer the door, Major Orange kicked the door in. He heard someone exclaim, "They have got guns," and he retreated to the street behind patrol cars. Some shots were exchanged, and he testified that he saw the appellant Ronald Williams at a window leaning out with a rifle in his hand, at which time he fired his tear gas gun into the window. He testified that Williams pointed the rifle at him (Johnson) before firing his tear gas gun. He further testified he heard Deputy Sheriff Zito yell, "There is someone at the window," before firing. Deputy Sheriff Johnson testified that he was not wounded or harmed, and shortly after firing the tear gas gun, two appellants and their companions crawled out of the premises and surrendered to the officers. At the close of the State's evidence the appellants moved to exclude same on the basis that the State had failed to prove an assault and had failed to make out a prima facie case. This was overruled by the trial judge. The thrust or gist of each appellant's testimony at trial was to the effect that they were attempting to assist Mrs. Bernice Turner by raising money in her behalf.

Mrs. Turner testified that she had been living at the premises of 222 Jefferson Boulevard, Tarrant City, Jefferson County, Alabama, for some ten, going on eleven, years prior to September 14, 1970; that she had received a first eviction notice, and that she had talked with Steve Meriweather and Wayland (Doc) Bryant on the afternoon in question pertaining to this. She testified that Steve Meriweather took her to see Attorney Arthur Shores, and they were endeavoring to get a three day postponement. She testified that she invited each of the appellants to come by her home

that evening, which they did, and stayed there overnight with three other companions to discuss a plan to raise some $1400.00, which was needed to pay for the premises in question. Mrs. Turner testified that she worked as a domestic servant for a Mrs. Keith in the Tarrant City area of Birmingham. She testified that she left her home on the morning of September 15, 1970, after seeing her two children off to school, and that she had a twenty-two caliber rifle which she had kept there at her home. On cross-examination, Mrs. Turner admitted she had received a final notice from the Sheriff's office of Jefferson County, Alabama, to the effect, "If you are not out by 8:00 A.M., September 15, 1970, we will have to set you out."

Each of the appellants took the stand and admitted going to Mrs. Turner's home on the evening of September 14, 1970, at her invitation accompanied by Robert Jakes; that subsequently Brenda Griffin and Harold Robinson came over later in the evening and remained with them through the night and the following morning; that during the evening Mrs. Turner had given them some food, and that a boarder who lived there with her had also been present; that the following morning, Mrs. Turner saw the children off to school, and that she left along with her boarder. Each appellant stated that with their three companions, they went to a meeting to distribute a leaflet to "politicize the community," the black community in Tarrant City, in an effort to raise money to help Mrs. Turner. The appellants admitted taking an Italian make rifle to Mrs. Turner's home with ammunition, but denied that there had been any discussion as to an ambush of any police officers. They further testified that they had Brenda Griffin go by and pick up a shotgun which was brought to the premises in question. Each appellant testified that they had a stereo record player at the premises, and they had returned there after distributing the leaflets on the morning in question. They testified that they were playing a record entitled "Black Gold" when they suddenly saw the door kicked open, and Bryant exclaimed, "You are breaking and entering." Bryant testified he had a telephone in his hand at this time, and at no time did he wave the shotgun, which was found on the floor of the house in question. Appellant Ronald Williams corroborated Bryant's testimony, and denied that he ever had the rifle in his hand or that he had pointed it out the window in the direction of Deputy Sheriff Johnson. Each of the appellants denied ever hearing anyone knock on the door or the officers announce their presence other than by kicking down the front door. Examination of the shotgun and rifle indicated that neither had been fired.

## I

Prior to trial, appellants' counsel filed a motion requesting a "motion for a free transcript" of the three-day preliminary hearing held on October 20, 1970, at the request of defense counsel. At the preliminary hearing, each of the appellants were represented by other attorneys than those who represented them at trial and now on appeal. At this time a Mr. Jerry Minatra, a private free lance court reporter, had been present at the request of defense counsel, and did take down and transcribe the testimony at this proceeding.

Appellants urge us to reconsider this court's prior opinion in this particular case as to this particular issue which was brought here on petition for writ of mandamus prior to trial to require the trial judge to order such free transcript of the preliminary hearing. The opinion of this court on this petition for writ of mandamus is reported as Williams v. Jasper, et al., 47 Ala.App. 91, 250 So.2d 699, cert. denied with opinion, Williams v. Jasper, et al., 287 Ala. 237, 250 So.2d 701.

We note from the record on trial of this cause that trial originally commenced on May 24, 1971, and after examination of Deputy Sheriff James L. Monteith on both direct and cross, a mistrial was entered and the cause continued for trial. The actual trial of this case and resulting appeal commenced on August 30, 1971, before the Honorable E. C. Watson, Jr., Circuit Judge. We also note that at this trial, each of the four deputy sheriffs who were called by the State and who gave testimony, that their affidavits were turned over on direction of the trial judge to appellants' counsel for their use in cross-examination of the deputies, and such was done, even though such is not required under Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103, under the opinions of the Supreme Court of Alabama and this Court. Sanders v. State, 278 Ala. 453, 179 So.2d 35; Smith v. State, 282 Ala. 268, 210 So.2d 826; Mabry v. State, 40 Ala. App. 129, 110 So.2d 250, cert. dismissed 268 Ala. 660, 110 So.2d 260. We are not required here to determine whether or not the appellants should be furnished a "record of sufficient completeness" of the preliminary hearing to defense counsel in preparing for trial inasmuch as our prior opinion, Williams v. Jasper, supra, and that of the Supreme Court of Alabama is determinative of this issue; moreover, as here noted, the appellants have made no showing as to why they failed to call Mr. Jerry Minatra, the court reporter present at the preliminary hearing, as pointed out in our prior opinion, for purposes of showing any discrepancies in the State's witnesses' testimony, or any reason for failing to raise this issue again at trial in chief in accordance with this Court's prior opinion, supra. Further, in light of the fact that appellants' counsel did have and use the testimony at the aborted trial on May 24, 1971, of Deputy Monteith and the affidavit of Deputy Monteith and each of the other three deputy sheriffs, we are of the opinion that the appellants have here failed to show that they "suffered prejudice," constituting actual injury. Williams v. Bailey, 5 Cir., 463 F.2d 247; and Bryant v. Bailey, 5 Cir., 464 F.2d 560.

## II

Prior to trial, appellants' counsel moved to quash the indictment against each appellant on a basis of the alleged systematic exclusion of black persons from the jury rolls of the grand and petit juries of Jefferson County, Alabama.

At trial, in support of this motion, the appellants offered the testimony of one Wilson Edward Still, Jr., an attorney who was in partnership with the other defense attorneys, who described the basis of a random sample of 1600 names which he took off the jury roll and forwarded in turn, after extensive examination of this sampling, to Mr. David Valinsky of New York City.

Mr. Valinsky testified that he was Chairman of the Statistics Department of the City University of New York and had prepared a number of statistical studies for both private industries and governmental bodies.

Professor Valinsky testified that he had given the basis of the 1600 sampling to Mr. Still, and had analyzed the results with the following findings based on a comparison of the jury rolls and voter lists of Jefferson County, Alabama. Professor Valinsky stated that there were approximately 238,000 persons of proper age residing in the Birmingham division who were eligible for jury service. . Of this number, approximately 53,300 were on the jury roll at the present time. Based on his study of the 1600 name sampling which had been sent to him of persons on the jury roll, he found that by comparison with the voter list for Jefferson County, which showed that 26.5% of the voter lists of Jefferson County were persons of the black race, and that only 20.8% of these names were on the jury roll, or a discrepancy of 5.7%. Professor Valinsky further testified from

his study that the white voter list showed that it contained approximately 79.2% white persons, and that of these approximately 73.5% were on the jury roll, with the same approximate discrepancy for white persons of approximately 5.7%.

■ The State countered this testimony through the testimony of Mr. Billy R. Whitley, Clerk of the Jefferson County Jury Board. Mr. Whitley stated that the last time the jury box was refilled was August, 1969, but they were currently in the process of updating this jury roll. Mr. Whitley testified that the Jury Commission sent people employed by them into the black community, in fact, that since the United States Court of Appeals' opinion in Billingsley v. Clayton, 5 Cir., 359 F.2d 13, some two persons had been employed who were members of the black race to canvass house to house seeking additional eligible persons to serve as jurors. Mr. Whitley further testified that State law only requires a minimum of 6% of the total population of the requisite age, 21 to 65, to be placed on the jury roll. He stated that there were considerably more than this on the Jefferson County Jury Roll, which contained approximately 53,000 persons out of a population of approximately 238,000 in the Birmingham division of Jefferson County. The State then offered the jury venire list for each week, commencing October 20, 1969, through June 14, 1971, showing the number of persons of the black race actually called in comparison with the total number called and the percentage of each which were black. These lists affirmatively show that the smallest percentage of black persons called was 16% (the week of October 12, 1970) to a high of 34% (the week of January 18, 1971), and 35.65% (the week of May 31, 1971). The law is clear that a defendant in a criminal case is not constitutionally entitled to demand a proportionate number of his own race on the jury which tries him, nor on the jury roll from which grand and petit jurors are selected. Cassell v. Texas, 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839.

As was stated in Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759:

"Neither the jury roll nor the venire need be a perfect mirror of the community or accurately reflect the proportionate strength of every identifiable group."

■ Moreover, this Court in Junior v. State, 47 Ala.App. 518, 257 So.2d 844, cert. denied, 288 Ala. 744, 257 So.2d 852, has specifically found that the Jury Commission of Jefferson County, Alabama, in its jury selection process, has not systematically excluded persons of the black race, nor is such jury roll tainted with systematic inclusion. The evidence here has wholly failed to establish that the jury roll produced a result which was "spectacularly was not a cross section of the community." Jackson v. Morrow, 5 Cir., 404 F.2d 903. The trial court, therefore, properly denied the appellants' motion to quash the jury venire on the ground of systematic exclusion of black persons. There has been no evidence given that different standards of qualification were applied by the Commissioners to the black community, or that the Jefferson County Jury Commission was influenced by racial considerations by making its selection of prospective jurors. White, et al. v. State, 48 Ala.App. 111, 262 So.2d 313.

III

■ Appellant also moved to quash the indictment, averring that the jury selection process for Jefferson County, Alabama, Title 62, Section 207–220, Code of Alabama 1940, Recompiled 1958, and Volume 14, Appendix, Section 714, Code, supra, did not grant to the appellants due process or equal protection of law. The appellants have wholly failed to give proof to support this allegation and motion, the gist of which is that the one for one strike method, which applies only to Jefferson County, Alabama, from a panel of 24 persons in noncapital cases, denied the appellants either due process or equal protection of

law as applied to other persons similarly situated.

■ As stated in Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492, " '[I]t is not asking too much that the burden of showing essential unfairness be sustained by him who claims such injustice and seeks to have the result set aside, and that it be sustained not as a matter of speculation but as a demonstrable reality.' "

We note here that since the appellants were tried together, they in fact did receive the two peremptory strikes for each allowed to the State, nevertheless, the motion to quash, attacking the law governing this procedure in Jefferson County, Alabama, was properly overruled. Slaughter v. State, 47 Ala.App. 634, 259 So.2d 840, cert. denied 288 Ala. 751, 259 So.2d 845.

## IV

Appellants' counsel, just prior to trial, made a motion for a mistrial and a change of venue due to the security precautions taken in and about the courthouse on the day of trial.

Testimony of attorneys as to their opinion of these precautions was offered by the appellants and by the State. Additionally, Sheriff Melvin Bailey, who was in charge of the security precautions at the courthouse was called to testify, and described what he determined to be the necessary security arrangements. Sheriff Bailey testified in essence that he had conferred with the United States Marshal's office in Birmingham and established at the Jefferson County Courthouse similar procedures as to those used at the trial of a school desegregation case at the Federal District Court in Birmingham the week before. Sheriff Bailey stated that he had locked all but one entrance to the courthouse, and that all persons who came through this doorway were registered. Moreover, on getting off the elevator at a particular floor, deputies would stop and photograph each person and have them walk through a sensing device for the purpose of detecting metal before admitting them to a given courtroom. Further, such persons were registered at a desk on each floor, and if metal or any other substances were detected, such were removed. Sheriff Bailey further stated that four guns were taken off persons seeking to enter the courtroom of Judge Watson on this date.

■ It is our opinion that the searching of spectators, or other persons, such as was here done, does not violate the appellants' constitutional right to a public trial, nor does such show prejudicial or unfair treatment as to preclude a fair and orderly trial of the appellants. Smith v. State, 247 Ala. 354, 24 So.2d 546, and cases cited.

Moreover, following voir dire examination of the jury venire by the attorneys, the trial court made the following inquiry:

"THE COURT: Ladies and Gentlemen, you may on today have noticed deputies around about the courthouse. You may have seen these individuals as you came in this morning, or when you left at noon, or came back at noon, or any time. I will ask you if the presence of these individuals in or about the courthouse here would in any wise influence the verdict of any one of you, and prevent you from being able to give a fair, just and impartial verdict to each of the Defendants as well as the State of Alabama?

"(No response.)

"THE COURT: I will ask you if there has been any single event that has transpired in the courthouse today, or that you have heard about, or seen, that would in any way keep you from giving each of these Defendants and the State of Alabama, a fair, just and impartial trial of the matter at issue here today?

"(No response.)

"THE COURT: Has any one of your number been convicted of a felony or a crime involving moral turpitude?

"(No response.)

"THE COURT: Has any one of your number been indicted on the charge of a felony, or of any crime involving moral turpitude within the last past twelve months?

"(No response.)

"THE COURT: I will hold that the jury is qualified to serve."

■ Under the circumstances as herein outlined, we are of the opinion that the trial judge did not abuse his discretion in not allowing the appellants to examine each juror individually, but, rather, directed that the appellants examine the venire as a whole. McPhearson v. State, 271 Ala. 533, 125 So.2d 709, and cases cited.

As pointed out in Hale v. United States, 5 Cir., 435 F.2d 737, "potential jurors need not be totally ignorant of the facts of a case." Further, as here, from *Hale*:

" . . . Appellant did not challenge a single juror for cause. On the basis of this record, appellant has failed to show that at the time of their empanelling the jurors were biased against him."

Appellants' motions were properly overruled.

V

■ Finally, appellants moved to quash the indictments against them because the penalty provided in Title 14, Section 374 (20), Code of Alabama 1940, Recompiled 1958, as amended 1967, provides greater punishment than that for certain other assaults which are by law misdemeanors.

We regard this contention to be wholly without merit as society's interest in the preservation of orderly process and procedure dictates that its representatives be accorded proper protection. The trial court properly overruled this motion filed by the appellants on this basis. Buchalter v. New York, 319 U.S. 427, 63 S.Ct. 1129, 87 L.Ed. 1492.

VI

At the close of the State's evidence, the appellants moved to exclude same on the basis that the State failed to prove assault within the meaning of law, and, further, failed to prove a prima facie case.

■ An "assault" has been defined by our Supreme Court in Johnson v. State, 35 Ala. 363, as follows:

"An assault is an attempt, or offer, to do another person violence, without actually accomplishing it. A menace is not an assault; neither is a conditional offer of violence. There must be a present intention to strike. On the question, how far the intention must be carried into actual execution, before the assault becomes complete in law, the authorities do not agree. Holding a gun in a threatening position, without any attempt to use it, or intention to do so, unless first assaulted by adversary, is not an assault. —Blackwell's Case, 9 Ala. 79. Drawing a pistol, without presenting or cocking it, is not an assault, as was decided in Lawson v. The State, 30 Ala. 14. The subject is considered in the following adjudged cases: The State v. Davis, 23 N.C. 125, 35 Am.Dec. 735; Morton v. Shopper, 3 Car. & Payne, 373; Stephens v. Myers, 4 Car. & Payne, 349; 1 Bish. Cr.Law, § 409, 2 Bish.Crim.Law, § 36."

In Flournoy v. State, 40 Ala.App. 629, 120 So.2d 121, the Court, per Price, P. J., defined assault in this manner:

" 'An "assault" is any attempt or offer, with force or violence, to do a corporal hurt to another, whether from malice or wantonness, with such circumstances as denote, at any time, an intention to do it, coupled with a present ability to carry such intention into effect.' Taylor v. State, 27 Ala.App. 538, 175 So. 698, 699; Tarver v. State, 43 Ala. 354; Burton v. State, 8 Ala.App. 295, 62 So. 394; Yates v. State, 22 Ala.App. 105, 113 So. 87."

■ We conclude that the testimony of the officers clearly established a legal as-

sault sufficient to allow the question to be presented to the trial jury, and that the appellants' motion was, therefore, properly overruled. Root v. State, 247 Ala. 514, 25 So.2d 182; and Brown v. State, 48 Ala. App. 456, 265 So.2d 898, and cases cited therein.

## VII

The appellants claim error by the trial court in the admission into evidence of a copy of the leaflet which was found at the house on the date in question by the Sheriff's deputies. We need not here quote this entire document. The closing paragraph contained the following statement:

"We know that the fastest Pig (Police) Force is going to try and stop us from gaining Political Power for the Black Working Man, so we have developed their philsophy [Sic] of Power, and that is 'Political Power Grows out of the Barrel of a Gun.' "

The determination of whether or not particular evidence is relevant rests largely in the sound discretion of the trial court. Roan v. Smith, 272 Ala. 538, 133 So.2d 224, and cases cited.

The rule pertaining to written statements allegedly made by the appellants or their companions just prior to the alleged assault here falls within the purview of the rule enunciated in Parsons v. State, 32 Ala. App. 266, 25 So.2d 44, as follows:

". . . In criminal cases inquiry can be made into the conduct and assertions of the defendant prior to an assault if they shed light on the motives and preparations for committing the offense. Burton v. State, 115 Ala. 1, 22 So. 585; King v. State, 19 Ala.App. 153, 96 So.2d 636; Cooley v. State, 7 Ala.App. 163, 62 So. 292; Bedsole v. State, 22 Ala.App. 274, 114 So. 786; Harden v. State, 211 Ala. 656, 101 So. 442."

Such literature bears on the intentions or motives of the appellants and was properly here admitted in evidence. Hall v. State, 208 Ala. 199, 94 So. 59; Parsons v. State, supra.

## VIII

We have carefully reviewed the requested charges, which were refused by the able trial judge, and determine that the evidence being in conflict, the affirmative charge as to each individual was properly refused. Charges 1, 6, 16, and 17 tend to emphasize only the appellants' version of the facts and were therefore invasive of the province of the jury; hence, such were properly refused.

The record in this cause consists of Four Volumes, containing some 761 pages. We have carefully reviewed this record, as we are required to do by Title 15, Section 389, Code of Alabama 1940, Recompiled 1958, and find same to be free from error. The judgment of the trial court is due to be and the same is hereby

Affirmed.

CATES, P. J., and ALMON and HARRIS, JJ., concur.

DeCARLO, J., recuses himself.